

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

v.

RANDA DARCEL CISTRUNK,

        Defendant.

Case No. 10-CR-117 (CNC)



## PLEA AGREEMENT

1.    The United States of America, by its attorneys, James L. Santelle, United States Attorney for the Eastern District of Wisconsin, and Brian J. Resler, Assistant United States Attorney, and the defendant, Randa Darcel Cistrunk, individually and by attorney Kathleen M. Quinn, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

### CHARGES

2.    The defendant has been charged in a single-count information which alleges a violation of Title 21, United States Code, Section 843(b), 841(a)(1) and 846.

3.    The defendant has read and fully understands the charge contained in the information and fully understands the nature and elements of the crime with which she has been charged and the charge and the terms and conditions of the plea agreement have been fully explained to her by her attorney.

4.    The defendant voluntarily agrees to waive prosecution by indictment in open court.

5.    The defendant voluntarily agrees to plead guilty to the following count set forth in full as follows:

## THE UNITED STATES ATTORNEY CHARGES:

On or about June 3, 2010, in the State and Eastern District of Wisconsin,

## RANDA DARCEL CISTRUNK

knowingly and intentionally used a communication facility, to wit: a telephone, to facilitate a conspiracy to posses with intent to distribute and distribute marijuana, a Schedule I controlled substance.

In violation of Title 21, United States Code, Section 843(b), 841(a)(1) and 846.

6. The defendant acknowledges, understands, and agrees that she is, in fact, guilty of the offense described in paragraph 5. The parties acknowledge and understand that if this case were to proceed to trial, the government would be able to prove the facts in Attachment A beyond a reasonable doubt. The defendant admits that the facts in Attachment A are true and correct and establish her guilt beyond a reasonable doubt

This information is provided for the purpose of setting forth a factual basis for the plea of guilty. It is not a full recitation of the defendant's knowledge of, or participation in, this offense.

## PENALTIES

7. The parties understand and agree that the offense to which the defendant will enter a plea of guilty carries a maximum term of four years imprisonment and a $250,000 fine. This count also carries a mandatory special assessment of $100 and up to one year of supervised release.

8. The defendant acknowledges, understands, and agrees that she has discussed the relevant statutes as well as the applicable sentencing guidelines with her attorney.

## DISMISSAL OF INDICTMENT

9. The government agrees to move to dismiss the indictment at the time of sentencing.

2

## ELEMENTS

10. The parties understand and agree that in order to sustain the charge of use of a telecommunications facility to facilitate a drug trafficking offense, as set forth in the information, the government must prove each of the following propositions beyond a reasonable doubt:

*First,* that the defendant used a communication facility, namely a telephone;
*Second,* that the use of the telephone facilitated the commission of the crime of conspiracy to possess with intent to distribute and distribute a controlled substance;
*Third,* that the use of the telephone was knowing or intentional..

## SENTENCING PROVISIONS

11. The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

12. The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

13. The parties acknowledge and agree that they have discussed all of the sentencing guidelines provisions which they believe to be applicable to the offense set forth in paragraph 5. The defendant acknowledges and agrees that her attorney in turn has discussed the applicable sentencing guidelines provisions with her to the defendant's satisfaction.

14. The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history. The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties

3

may not have full and complete information regarding the defendant's criminal history. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of defendant's criminal history.

## Sentencing Guidelines Calculations

15. The parties acknowledge, understand, and agree that the sentencing guidelines calculations included in this agreement represent the positions of the parties on the appropriate sentence range under the sentencing guidelines. The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

## Relevant Conduct

16. The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge may consider relevant conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offense to which defendant is pleading guilty.

17. The parties acknowledge and understand that the government will recommend to the sentencing court that the relevant conduct attributable to the defendant is at least 80 kilograms of a mixture and substance containing marijuana, a Schedule I controlled substance.

4

## Base Offense Level

18.     The parties agree to recommend to the sentencing court that the applicable base offense level for the offense charged in the information is 24 under Sentencing Guidelines Manual §2D1.6 and 2D1.1(c)(8).

## Acceptance of Responsibility

19.     The government agrees to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), but only if the defendant exhibits conduct consistent with the acceptance of responsibility. The defendant acknowledges, understands, and agrees that conduct consistent with the acceptance of responsibility includes but is not limited to the defendant's voluntary identification and disclosure to the government of any and all actual or potential victims of the offense prior to sentencing. In addition, if the court determines at the time of sentencing that the defendant is entitled to the two-level reduction under § 3E1.1(a), the government agrees to make a motion recommending an additional one-level decrease as authorized by Sentencing Guidelines Manual § 3E1.1(b) because the defendant timely notified authorities of her intention to enter a plea of guilty.

## Sentencing Recommendations

20.     Both parties reserve the right to apprise the district court and the probation office of any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offense as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

21.     Both parties reserve the right to make any recommendation regarding any other matters not specifically addressed by this agreement.

5

22.   The government agrees to recommend a sentence within the applicable sentencing guideline range, as determined by the court.

## Court's Determinations at Sentencing

23.   The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The United States Probation Office will make its own recommendations to the sentencing court. The sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth in paragraph 7 above. The parties further understand that the sentencing court will be guided by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

24.   The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

## FINANCIAL MATTERS

25.   The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable upon entry of the judgment of conviction. The defendant agrees not to request any delay or stay in payment of any and all financial obligations.

## Special Assessment

26.   The defendant agrees to pay the special assessment in the amount of $100 prior to or at the time of sentencing.

6

## DEFENDANT'S WAIVER OF RIGHTS

27.     In entering this agreement, the defendant acknowledges and understands that in so

doing she surrenders any claims she may have raised in any pretrial motion, as well as certain rights

which include the following:

    a.      If the defendant persisted in a plea of not guilty to the charges against her, she
            would be entitled to a speedy and public trial by a court or jury. The
            defendant has a right to a jury trial. However, in order that the trial be
            conducted by the judge sitting without a jury, the defendant, the government
            and the judge all must agree that the trial be conducted by the judge without
            a jury.

    b.      If the trial is a jury trial, the jury would be composed of twelve citizens
            selected at random. The defendant and her attorney would have a say in who
            the jurors would be by removing prospective jurors for cause where actual
            bias or other disqualification is shown, or without cause by exercising
            peremptory challenges. The jury would have to agree unanimously before it
            could return a verdict of guilty. The court would instruct the jury that the
            defendant is presumed innocent until such time, if ever, as the government
            establishes guilt by competent evidence to the satisfaction of the jury beyond
            a reasonable doubt.

    c.      If the trial is held by the judge without a jury, the judge would find the facts
            and determine, after hearing all of the evidence, whether or not he was
            persuaded of defendant's guilt beyond a reasonable doubt.

    d.      At such trial, whether by a judge or a jury, the government would be required
            to present witnesses and other evidence against the defendant. The defendant
            would be able to confront witnesses upon whose testimony the government
            is relying to obtain a conviction and she would have the right to cross-
            examine those witnesses. In turn the defendant could, but is not obligated to,
            present witnesses and other evidence on her own behalf. The defendant
            would be entitled to compulsory process to call witnesses.

    e.      At such trial, defendant would have a privilege against self-incrimination so
            that she could decline to testify and no inference of guilt could be drawn from
            her refusal to testify. If defendant desired to do so, she could testify on her
            own behalf.

7

28. The defendant acknowledges and understands that by pleading guilty she is waiving all the rights set forth above. The defendant further acknowledges the fact that her attorney has explained these rights to her and the consequences of her waiver of these rights. The defendant further acknowledges that as a part of the guilty plea hearing, the court may question the defendant under oath, on the record, and in the presence of counsel about the offense to which the defendant intends to plead guilty. The defendant further understands that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

29. The defendant acknowledges and understands that she will be adjudicated guilty of each offense to which she will plead guilty and thereby may be deprived of certain rights, including but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

30. The defendant knowingly and voluntarily waives all claims she may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

## Further Civil or Administrative Action

31. The defendant acknowledges, understands, and agrees that the defendant has discussed with her attorney and understands that nothing contained in this agreement or the Stipulation of Facts Relative to Sentencing, included in this plea agreement as Attachment A, is meant to limit the rights and authority of the United States of America or any other state or local government to take further civil, administrative, or regulatory action against the defendant, including

8

but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans, and benefits from United States government agencies.

## GENERAL MATTERS

32.    The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

33.    The parties acknowledge, understand, and agree that this plea agreement will be filed and become part of the public record in this case.

34.    The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

35.    The defendant understands that pursuant to the Victim and Witness Protection Act and the regulations promulgated under the Act by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offense on the victim and further may make a recommendation regarding the sentence to be imposed. The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

## Further Action by Internal Revenue Service

36.    Nothing in this agreement shall be construed so as to limit the Internal Revenue Service in discharging its responsibilities in connection with the collection of any additional tax, interest, and penalties due from the defendant as a result of the defendant's conduct giving rise to the charges alleged in the information.

9

## EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

37.     The defendant acknowledges and understands that if she violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. The defendant further acknowledges and understands that the government's agreement to dismiss any charge is conditional upon final resolution of this matter. If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to reinstate any and all dismissed charges and to file any and all charges which were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of her breach of this agreement. The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing. If the defendant and her attorney have signed a proffer letter in connection with this case, then the defendant further acknowledges and understands that she continues to be subject to the terms of the proffer letter.

## VOLUNTARINESS OF DEFENDANT'S PLEA

38.     The defendant acknowledges, understands, and agrees that she will plead guilty freely and voluntarily because she is in fact guilty. The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

10

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney, and I am satisfied that my attorney has provided effective assistance of counsel.

Date: _05/05/11_

RANDA DARCEL CISTRUNK
Defendant

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: _05/05/11_

KATHLEEN M. QUINN
Attorney for Defendant

For the United States of America:

Date: _5/6/11_

JAMES L. SANTELLE
United States Attorney

Date: _5/6/11_

BRIAN J. RESLER
Assistant United States Attorney

11

## ATTACHMENT A

*(In support of Plea Agreements: U.S. v. Michael Bond et al, 10-CR-117 (CNC))*

### INTRODUCTION

1.     In January 2009, the Milwaukee District Office (MDO) of the DEA initiated an investigation, which eventually included a number of other agencies, targeting the Michael BOND (hereinafter "BOND") drug trafficking organization in Milwaukee, Wisconsin. The investigation to date has included: (1) historical statements of confidential sources (or "CIs") and cooperating defendants; (2) interception of hundreds of calls from consensual as well as court-ordered Title III wire intercepts; (3) information from pen register and trap and trace devices; (4) electronic surveillance; (5) controlled purchases of marijuana; (6) search warrants; and (7) grand jury subpoenas. The following is a summary of the information gathered to date.

2.     This investigation revealed that the Bond organization distributed well over 1000 kilograms of marijuana between approximately October 1, 2008 through June, 2010 primarily via FedEx shipments from a Mexican source of supply, "Easy." BOND has been identified as a source of supply to other distributors in Wisconsin. BOND and his associates sent payments for "fronted" drug shipments to individuals in El Paso, Texas, Socorro, Texas, and Ciudad Juarez, Mexico, via Moneygram transactions, as well as through cash deposits in accounts at financial institutions. BOND was the leader of the organization, responsible for directing all aspects of receiving shipments of marijuana from "Easy," storing, repackaging and distributing the marijuana in the Milwaukee area, and returning proceeds to the source of supply. Although members of the organization were involved at different times, all members involvement ceased following search warrants and arrests in June, 2010.

#### Michael BOND and Valerie BROWN

3.     CS #1 stated that BOND started contacting him/her via telephone after BOND was released from FCI Beaumont in March 2008, for the purpose of re-establishing their drug trafficking activities. CS #1 met twice in person with BOND in November and December 2008 at a residence BOND shared with Randa Darcel CISTRUNK, located at 25XX N. 39th Street, Milwaukee, Wisconsin. The first time BOND showed CS #1 a dark blue plastic bin secreted in the attic of that residence, which contained what appeared to be in excess of 50 pounds of marijuana. BOND explained to CS #1 how he received the marijuana from his Mexican source of supply, and how he sends payment for the fronted drug shipments back to the SOS, as well as to other co-conspirators in the drug trafficking organization (DTO). BOND told CS #1 that the drugs were delivered via FedEx shipments, delivered at various addresses.

1

4. The second time CS #1 met with BOND, BOND picked up what appeared to be a large painting, described as a Mexican or Southwest landscape painted on wood, approximately 3'x3'x2" in size from an unknown female's apartment, which BOND used as a stash house. BOND and CS #1 then drove to BOND's residence at 25XX N. 39th Street. CS #1 observed BOND pry apart the wood with a crowbar and a hammer. BOND then extracted two large tubes of compressed marijuana from the inside of the painting and tossed it into a large plastic storage bin. CS #1 visually identified CISTRUNK's residence to agents, as well as BOND and BROWN's current address at 40XX N. Sherman Boulevard. CS #1 also confirmed BOND's identity, a person CS #1 has known for over 20 years, from a photo.

5. In May 2009, CS #3 spoke with agents regarding the activities of Michael BOND and members of his DTO. CS #3 stated that BOND had recruited an individual identified as Valerie BROWN, who is BOND's current girlfriend. CS #3 identified BROWN as a leader in the BOND DTO, and said she was active in all aspects of recruitment, drug pick-ups, drug distribution and money laundering. According to information from CS #3 and corroborating evidence, BROWN picked up drug proceeds in the form of US Currency, and then laundered those proceeds, with the assistance of friends and family members she recruits. Drug proceeds were sent by BOND, BROWN, and other designees acting on behalf of the BOND DTO to individuals in Texas and Mexico via Moneygram wires and deposits into bank accounts as payment for fronted drug shipments. CS #3 said that the drug shipments (marijuana and/or cocaine) BOND was receiving via FedEx were concealed in all different types of picture frames in various sizes. This is consistent with information CS #1 provided during debriefings in January 2009. CS #3 also identified BOND and BROWN's address as 40XX N. Sherman Boulevard.

6. CS #3 further provided information and evidence to agents regarding the money laundering activities of the Michael BOND DTO, including receipts showing money laundering of suspected drug proceeds by Valerie BROWN and others conducted via Moneygram, as well via cash deposits into bank accounts, on behalf of the DTO. Five original documents provided to agents show that Valerie BROWN and others laundered $13,500 in a six (6) day time period in April 2009. Additional evidence reflected that $7,299.21 was sent by members of the BOND DTO via Moneygram transactions to individuals in El Paso and Socorro, Texas; and Ciudad Juarez, Mexico. CS #3 told agents that he/she observed piles of such receipts, showing multiple daily transactions in amounts of thousands of dollars.

7. Evidence recovered through CS #3 further included 21 pieces of broken and hollowed out wooden pictures/frames, clear plastic wrap, and four pieces of newspaper that were recovered on July 30th, 2009, from a dumpster within minutes after BROWN discarded them. These items were packaging from one of BOND's drug shipments.

8. On January 31, 2010, CS#1 advised agents that BOND had called him with a proposition. CS #1 proceeded to record telephone calls to/from BOND from January 27, 2010 through February 2, 2010. During these calls, CS #1 and BOND arranged for the controlled purchase of one pound of marijuana for $1,500 to take place the first week of February 2010. BOND also told

CS #1 that he was planning to ship his (BOND's) van to El Paso, Texas via train, for the purpose of concealing 200 pounds of marijuana inside it. BOND was directing CS#1 to pick up the van in El Paso, and drive it back to Milwaukee. BOND told CS#1 that the Mexicans would need about a week to take the van apart to conceal the drugs. This was to transpire only if the Mexicans could source BOND with 200 pounds of marijuana at a time. These calls were confirmed by pen register data for BOND's telephone, (414) 640-0250. Pen register and trap and trace data showed BOND was in frequent and consistent contact with (915) 319-3262, an El Paso, Texas based telephone, and in some cases called within minutes after speaking with CS #1. Electronic surveillance, pen register and trap and trace data, and information received from CS #1 revealed that BOND made efforts in furtherance of this plan in the form of telephone calls, looking up airline prices, and his vehicle was recorded in the vicinity of the railroad yard shipment point, located on Jones Island in Milwaukee, Wisconsin, on February 5, 2010.

9.      At the direction of agents, CS #1 conducted three controlled purchases of marijuana from BOND. The first two purchases, on February 2 and March 31, 2010, occurred inside CISTRUNK's residence. The last controlled purchase, on May 27, 2010, occurred inside BOND'S and BROWN's residence at 40XX N. Sherman Boulevard. Regarding the last incident, CS #1 stated that BOND and BROWN had approximately ten pounds of marijuana on their dining room table, and were packaging it for distribution when he walked into the residence to conduct the purchase. Agents on surveillance noted that just prior to CS #1's arrival, BOND opened the overhead door to the detached garage, removed something, closed the garage door and carried that item into the residence concealed in a white plastic garbage bag. CS #1 exited the residence carrying what appeared to be the same white bag. The bag contained approximately two pounds of marijuana, packaged in gallon-sized zip-lock baggies. During a debriefing after the purchase, CS #1 stated that he observed approximately six pounds of marijuana, packaged in baggies for distribution, concealed near a car top carrier in BOND's garage.

10.     On May 23, 2010, at approximately 6:25 PM, agents intercepted a call to BOND from a "Marvin" (the caller's identity has not been confirmed). "Marvin" told BOND that he was "re-grouping last night...getting fresh." Marvin and BOND discussed BOND's possession of a stolen $50,000 ring, and BOND told Marvin he planned to go to Mexico in September, where he will trade the ring for 75 pounds of weed. BOND explained, "I'll take 75 pounds of weed for it, 'cause 75 pounds of weed ain't nothing but $25,000." BOND told Marvin that he gets five pounds for $1,000, and a kilo of weed is only $50 down in Mexico. BOND further stated, "I got three niggas on the line; Pooney, Darius, and one of Darius' friends. I'm clearing $20,000 a week." BOND explained that one has to find distributors in three different areas so their clientele base doesn't overlap. Marvin asked about a subject named "Rick," to which BOND replied that he would give Rick two or three pounds. BOND said Rick isn't a big deal, as he only sells dimes. BOND told Marvin about all the different types of weed he could get, including weed that had crystal (methamphetamine) in it. BOND told Marvin, "The high priced weed attracts the Feds, because the clientele that buy it are being watched by the Feds..." BOND referred to his clientele as the "misdemeanor clientele." Marvin asked BOND if he knew anyone who had Hydro (a high end variety of marijuana). BOND said he had some, and sold Darius (BOND) a pound for $5,000 that

3

day, from which Darius made a $10,000 profit. BOND did not want to deal that type of weed, and stated, "I don't need that in my life. I'm paying $200 a pound, selling it for eight ($800), and keeping the heat off me." BOND further stated that the dogs can't smell the weed he received. BOND then told Marvin how he got five "keys" of cocaine in the past, and broke it down into ounces.

11. On May 27, 2010, at approximately 2:01 PM, BOND received a call from Valerie BROWN. BROWN told BOND that everything was done. BOND replied, "Hold the receipt until…text Easy (SOS' nickname) back when you get the word to say call me as soon as they get it, so I can get rid of this paperwork." BROWN said that the payments were going to be short by $200 each, due to the fees charged (by Moneygram), and that both transactions were for $1,400 each. BOND complained, and BROWN told him they had to find a new way to send them. BROWN suggested using re-loadable platinum Visa cards. BROWN stated, "Listen Daddy, you just go to Wal-Mart, you buy them little cards. Whenever they get emptied, you can load 'em. You can load up to $5,000 on a card. You ain't got to keep doin' that…all you doin' is picking up the phone, dialing a number, and loadin' up money on that card. Why don't you tell him (SOS) to check into that?" BROWN added that they are losing money this way, and it only costs $2.00 to load a card. BROWN further stated that it would be cheaper to do express mail than what they are right now, and it would leave less of a paper trail.

12. Based upon information obtained through debriefings of cooperating defendants, BROWN assisted BOND with most aspects of the operation, including drug shipments, storage, distribution, transportation and returning proceeds to via Moneygram transactions to BOND's Mexican source of supply, "Easy." BROWN was further the only one, other than BOND, permitted to speak to "Easy."

## Darius BOND

13. CS #1 advised agents that Darius BOND distributed ten pounds of marijuana per week for Michael BOND, and with CS #3, advised he was an enforcer for the BOND DTO.

14. Physical and electronic surveillance from December 28, 2009 through June, 2010, repeatedly placed members of the BOND DTO at 27XX W. Center Street, the apartment building where Darius BOND resided, and the dates they converged at that location appeared to correlate with dates BOND's drug shipments were supposed to arrive.

15. On May 21, 2010, agents intercepted a call to BOND from Darius BOND, at (414) 610-4868. This phone is subscribed to Michael BOND. Darius BOND wanted BOND to call him when BOND was finished making deliveries. Darius BOND stated, "All right…do you, when you get through, 'cause I really want my guy to call me. I got a band on me. I got that on me now, so whenever you feel like calling me." BOND asked Darius BOND if he wanted the eight (pounds of marijuana), and Darius BOND replied, "Yeah, I'm gonna wait. I still got four. I been zipping, you know what I'm saying? In Ziploc bags…zip, zip, zip. There was a rush at first, and then the

4

motherfucker just...probably something new got in town." Darius BOND told BOND to stop by his house if he is down that way.

16. At 9:50 AM that date, in another intercepted call, BROWN and Michael BOND talked about Darius BOND. BOND was concerned because five police cars supposedly followed Darius BOND. BROWN commented, "He thinks where they moved down there, they in a good spot. Please! That police territory down there!" BOND stated, "On Center Street?" BROWN replied, "Yeah. He be coming and going, they just pulling up in their cars and they all on camera...camera right up on the door!" BROWN felt Darius BOND was being reckless in the manner in which he was dealing.

17. On May 29, 2010 at approximately 6:05 PM, BOND received another call from Darius BOND. Darius BOND told BOND that BOND left without his book. Darius BOND asked BOND if he wants him to keep the book at his house. BOND told Darius BOND to have his girl put it in her purse.

18. Based upon information obtained through debriefings of cooperating defendants, Darius BOND, Michael BOND's nephew, distributed 4 to 8 pounds of marijuana, for and fronted by Michael BOND, weekly, beginning in March, 2009, except for an approximate 6 month period where alternately Darius BOND's probation was revoked and Michel BOND was incarcerated.

## Dominique PHILLIPS

19. CS #1, stated that BOND's nephew, Dominique PHILLIPS, also known as "POONEY," was a distributor for the BOND DTO, and operated a drug house on behalf of the BOND DTO at 27XX N. 20th Street, Milwaukee, Wisconsin. CS #1 stated that PHILLIPS distributed between 25-30 pounds of marijuana per week for the BOND DTO.

20. A Milwaukee HIDTA informant advised agents in January, 2009, that PHILLIPS, a.k.a. "Pooney" was distributing marijuana at 27XX N. 20th Street, and further stated that he/she had previously observed PHILLIPS in possession of an AK-47 assault rifle inside that residence. The informant conducted a controlled purchase of marijuana from PHILLIPS inside the kitchen at this location on January 19, 2009, and observed several pounds of marijuana inside the kitchen. US Cellular toll records received via subpoena for one of BOND'S phones, (414) 640-0250, showed that BOND called PHILLIPS' number (used in arranging the controlled purchase), (414) 419-8244, 396 times between October 31, 2008 and January 23, 2009.

21. Agents' review of police records indicate that in February 2009, PHILLIPS was arrested at 27XX N. 20th Street by the Milwaukee Police Department for possession of a stolen .357 revolver and marijuana. PHILLIPS was arrested again on March 29, 2009, when MPD executed a search warrant on the residence at 27XX N. 20th Street and recovered over 3,000 grams of marijuana. PHILLIPS was subsequently charged and convicted of Possession With Intent to Deliver

5

Marijuana, and was incarcerated in the Wisconsin State Prison system. CS #1 stated that BOND deposits $100 per month into PHILLIPS' prison account as a gratuity for not cooperating with law enforcement.

22.     On April 15, 2010, at about 5:15 PM, during a recorded call between CS #1 and BOND, BOND told CS #1 that POONEY (PHILLIPS) was a better and smarter hustler (drug dealer) than Darius (Darius BOND). BOND admitted to CS #1 that he wanted to get one of PHILLIPS' guns last week, but decided against it, as he feared the police would catch him riding down the street with it. CS #1 asked if BOND was going to Maxine's (Maxine BOND; BOND's sister and PHILLIPS' mother) to get it. BOND replied yes, and that Maxine told him to come and get the guns, as BOND had discussed it with PHILLIPS, and told PHILLIPS that he, "needed one of those heaters."

23.     On May 23, 2010, at approximately 6:25 PM, agents intercepted a call to BOND from "Marvin" (the subscriber's identity has not been confirmed) at (414) 719-0559. Marvin told BOND that he was "re-grouping last night...getting fresh." Marvin and BOND discussed BOND's possession of a stolen $50,000 ring, and BOND told Marvin he planned to go to Mexico in September, where he will trade the ring for 75 pounds of weed. BOND explained, "I'll take 75 pounds of weed for it, 'cause 75 pounds of weed ain't nothing but $25,000." BOND told Marvin that he gets five pounds for $1,000, and a kilo of weed is only $50 down in Mexico. BOND further stated, "I got three niggas on the line; Pooney, Darius, and one of Darius' friends. I'm clearing $20,000 a week." BOND explained that one has to find distributors in three different areas so their clientele base doesn't overlap. Marvin asked about a subject named "Rick," to which BOND replied that he would give Rick two or three pounds. BOND said Rick isn't a big deal, as he only sells dimes. BOND told Marvin about all the different types of weed he could get, including weed that had crystal (methamphetamine) in it. BOND told Marvin, "The high priced weed attracts the Feds, because the clientele that buy it are being watched by the Feds..." BOND refers to his clientele as the "Misdemeanor clientele." Marvin asked BOND if he knew anyone who had Hydro. BOND said he had some, and sold Darius (BOND) a pound for $5,000 that day, from which Darius made a $10,000 profit. BOND does not want to deal that type of weed, and stated, "I don't need that in my life. I'm paying $200 a pound, selling it for eight ($800), and keeping the heat off me." BOND further stated that the dogs can't smell the weed he gets. BOND then told Marvin how he got five "keys" of cocaine in the past, and broke it down into ounces.

24.     On June 6, 2010, at approximately 1:11 PM, agents intercepted a phone call between Michael BOND and Darius BOND. During the call, BOND said PHILLIPS talked to him earlier that day about coming home (from prison) and BOND said he (PHILLIPS) was going to get back in (drug dealing for the BOND DTO) right away.

25.     On June 9, 2010, agents arrested PHILLIPS' mother, Maxine BOND, at her residence and executed a search warrant. A loaded .38 caliber revolver was found in the nightstand drawer, next to her bed. A card was also located during the search warrant. This card indicated that someone had rented unit #A141 at Public Storage, located at 5730 N. Lovers Lane Road, Milwaukee.

6

Seized bank statements for Maxine BOND's account reflected she paid for the storage unit rental from her bank account. On June 9, 2010, Maxine BOND gave written consent for agents to search this storage unit. Agents found an SKS assault rifle with loaded magazines next to it, an AK-47 assault rifle with loaded magazines next to it, a MAC 10 submachine gun and a .357 handgun with a scope inside unit #A141. According to Public Storage records, Maxine BOND's live-in boyfriend, O.H., rented the unit on March 23, 2009; six days before the search warrant at 27XX N. 20th Street. Records showed that only Maxine BOND and Dominique PHILLIPS has access to the unit, and the unit rental was paid through Maxine BOND's bank account.

### Alcie BUTLER

26.     CS #3 had previously identified a male known as "Preacher" as possibly being involved with the BOND DTO. CS #3 did not know Preacher's true name, but told agents he worked at HAROLD & SONS CAR WASH, at 1422 N. 27th Street.

27.     On May 25, 2010, at approximately 10:01 AM, agents intercepted an outgoing telephone call from Michael BOND's telephone to (414) 544-7055. The male told BOND he needed a "QP." BOND told the male he was on his way. Agents believe "QP" is code for ¼ pound of marijuana.

28.     At approximately 10:32 AM, agents observed Michael BOND meeting Alcie BUTLER (Preacher) at HAROLD & SONS CAR WASH. BUTLER exited BOND's Cadillac holding a white plastic bag and a NY baseball hat. The bag was consistent in shape and size with a quarter pound of marijuana. Agents did not observe BUTLER leave the business after this delivery.

29.     Based upon intercepted telephone calls, BUTLER ordered two ¼ pound deliveries of marijuana on June 1, 2010 at 12:00 PM, and again at 4:03 PM. On June 3, 2010, BOND told BUTLER that he would put his order on the side. On June 4, 2010, BUTLER ordered another ¼ pound delivery of marijuana from BOND.

30.     According to pen register data, (414) 544-7055 had a total of 112 calls to and from BOND's phone from May 19 through June 6, 2010. These calls are comprised of drug-related conversations, and from the content, it appeared that BOND "fronted" the drugs to BUTLER, and collected payment later.

31.     Based upon information obtained through debriefings of cooperating defendants, BUTLER was a mid-level distributor for Michael BOND, and received quarter to half pound quantities of marijuana from BOND approximately 2 to 3 times weekly starting in late 2009.

7

### Gerald HUMPHREY

32. On May 23, 2010, at approximately 3:59 PM, during an intercepted telephone call, BOND spoke with a male who was verbally identified as "Gerald," at telephone number (414) 837-9040 (identified as Gerald HUMPHREY). Bond told HUMPHREY, "Don't fuck with my money. It's not my money. I gotta pay people that money man." HUMPHREY replied, "I know Mike." BOND stated, "Gerald, I'm not going to fuck up my plug with this stupid shit right now." Approximately one hour later, at 4:57 PM, BOND called HUMPHREY and asked, "What it do Gerald? It right?" HUMPHREY replied, "I ain't got nothing to weigh it up. It's kind of shaky, but I'll work with it." BOND asked where his sister's scale was, and HUMPHREY replied that his sister was gone, and would not be back until tomorrow. BOND said, "There's supposed to be 28 grams in an ounce Gerald." HUMPHREY told BOND he knew this; 28 grams in an ounce, 14 in a half. HUMPHREY added, "I'm just making sure you get your money up top." BOND told HUMPHREY to have his nephew "…check out that weed right out there. Tell him the pounds over 800 ($800) though." HUMPHREY said he would do that, and BOND reminded him that he got 800 for his, nothing less.

33. On May 24, 2020, at approximately 1:28 PM, BOND received a call from Gerald HUMPRHEY from (414) 837-9040. HUMPHREY told BOND that he needed to see him, as BOND was a little less than a half an ounce short. They debated the weight, and BOND told HUMPHREY to call when he picked up the money.

34. At approximately 1:50 PM, HUMPHREY again called BOND to let BOND know that he had 20 grams left, and had just sold three of them for 55 ($55) a piece. HUMPHREY told BOND he had 200 ($200), and asked BOND to bring him another one. BOND directed Gerald to take the bus up to his residence. In a subsequent call, BOND told Gerald to come though the alley.

35. On May 25, 2010, at approximately 3:40 PM, BOND received a call from Gerald HUMPHREY, who told BOND that, "he needed another right now." HUMPHREY explained that his customer was across the street and he wanted two, but he only had one left. HUMPHREY assured BOND he had all his money, and told BOND that his customer needed another ounce, and HUMPHREY didn't want him going anywhere else. Agents observed BOND leave HUMPREY's residence at 15XX N. 39th Street just after this call, but did not observe HUMPHREY leave the residence after the delivery.

36. On May 26, 2010, at approximately 9:51 AM, HUMPHREY again called from (414) 837-9040 and told BOND that his nephew just got 3,000 ($3,000), and said he was trying to get five of them. BOND replied, "That impossible. All he get, they go for 800 a piece. I ain't going any lower."

37. Pen register and trap and trace data revealed that there were a total of 28 calls to/from (414) 837-9040 and BOND's phone from May 19 through June 6, 2010, and there were 31 calls to/from (414) 933-1446, which is the home telephone number subscribed to a relative of

8

HUMPHREY's at that address, during this same time frame. These calls are comprised of drug-related conversations, and from the content, it appeared that BOND "fronted" the drugs to BUTLER, and collected payment later.

38.     Agents executed a search warrant at HUMPHREY's residence at 15XX N. 39th Street, Milwaukee, on June 9, 2010, and located approximately 3 pounds of marijuana and a triple-beam scale.     Based upon information obtained through debriefings of cooperating defendants, HUMPHREY was a mid-level dealer to whom BOND fronted quarter-pound quantities of marijuana one to two times weekly, beginning in May, 2010.

### Michael JELKS

39.     On January 23, 2009, US Cellular provided DEA with subscriber information and toll records for the dates between November 1, 2008 and January 23, 2009 for Michael BOND's cell phone: (414) 640-0250. The records received showed that BOND was in regular contact with number (414) 610-0114, identified as being used by Michael JELKS. These records revealed 79 calls to and from this number during the time period these and other related phone records were requested.

40.     On May 24, 2010 at approximately 6:56 PM, agents intercepted an incoming telephone call to BOND's telephone from (414) 610-0114. Michael JELKS asked BOND where he was, and BOND replied he was in downtown Milwaukee. JELKS asked BOND to meet him, stated he was by the alley, and that BOND would know where he was. Bond told JELKS he was on his way. At approximately 7:29 PM, agents observed BOND meet with JELKS and deliver suspected marijuana in the alley behind 2741 N. 23rd Street.

41.     On May 25, 2010, at approximately 12:23 PM, agents intercepted an incoming telephone call to BOND's telephone from JELKS at (414) 610-0114. BOND asked, "What up?" and JELKS replied, "One time," to which BOND stated, "I'm on my way." Based upon calls intercepted to date, and the context of the code used in the call, agents understand "one time" to mean one pound of marijuana. At approximately 12:45 PM, agents observed BOND, now wearing a yellow baseball cap and matching shirt, meet with JELKS at 2471 N. 23rd Street inside the garage. At approximately 3:29 PM, agents intercepted another call from BOND's telephone to JELKS. BOND asked, "What he do?" JELKS replied, "Dude said he gonna grab it when he get done with work. I got it on deck." BOND told JELKS to call him and assured him he "wasn't tripping on nothing." JELKS said he would call BOND and would be in the alley.

42.     At approximately 6:54 PM, agents intercepted another incoming telephone call to BOND's telephone from JELKS, wherein he told BOND to "bring one more over there" and meet by the house. BOND stated he was on his way. Agents understand that "one more" is another pound of marijuana. At approximately 7:31 PM, agents observed Michael BOND exiting the fenced yard of 2741 N. 23rd Street. Agents did not observe JELKS leave the residence. BOND walked

9

southbound in the alley to where his Corvette was parked.

43. On June 3, 2010 at approximately 8:45 AM, agents intercepted a telephone call to BOND's telephone from (414) 627-1361 (Darius BOND). Darius BOND asked Michael BOND where he was, and Michael BOND replied, "Payday alley." At approximately 8:47 AM, agents witnessed Michael BOND deliver suspected marijuana to JELKS at 27XX N. 23rd Street.

44. Based upon pen register and trap and trace data from the wiretap, (414) 610-0114 had a total of 14 calls to/from BOND's phone from May 19 through June 6, 2010. These calls are comprised of drug-related conversations, and from the content, it appeared that BOND "fronted" the drugs to JELKS, and collected payment later. Based upon information obtained through debriefings of cooperating defendants, JELKS primarily middled marijuana transactions for Michael BOND, though BOND periodically sold smaller amounts of marijuana to JELKS.

**Ladell WHITE**

45. On May 25, 2010, at about 9:55 AM, agents intercepted an incoming call to Michael BOND from (414) 313-0442. The male, later identified as Ladell WHITE, told BOND, "Hello. You locked me in right here. It ain't the same shit as last time, that dark shit." BOND asked WHITE where he was, and WHITE replied he was at the job. BOND told WHITE he was on the way. WHITE responded, "It's that A-1," to which BOND commented, "A-1 baby." At 10:11 AM, BOND called WHITE. Bond said, come on outside baby, " and WHITE said, "Here I come."

46. On May 30, 2010, in a series of calls between BOND and WHITE, WHITE placed an order for "a halfer," which agents believe means a half-pound of marijuana. BOND asked WHITE where he was, and WHITE replied, "In motion." BOND asked how long he was going to be, and WHITE said he would call BOND when he was down that way. BOND added, "Call me at 1:30 PM, and we can meet. I'm going to have it with me." At 1:34 PM, they spoke again and BOND told WHITE he would see when he could meet him. BOND stated, "I'm out and about to make another move (a delivery) and take care of somebody else. I got the stuff on me...I don't want to be riding around with it." At 2:10 PM, WHITE called BOND and said, "Chris is going to meet you. You know, the one with the braids-my little brother." BOND arranged to meet "Chris" at the Kentucky Fried Chicken (KFC) restaurant, located near N. 3rd St and W. North Ave. At 2:34 PM, BOND received a call from WHITE. WHITE stated, "What happen baby? I thought you were meeting." BOND said, "I'm here waiting on you all." WHITE told BOND he thought BOND was going to call him when BOND got there.

47. At 2:20 PM, agents conducted surveillance at the KFC located at 2470 N. Martin Luther King Drive, in conjunction with the intercepted phone calls. At 2:21 PM, agents observed BOND walking towards N. 4th Street and W. Wright Street. At 2:43 PM, agents observed a black male, wearing a black shirt, waving to a gray Chevy Impala, 525-RUV that was backed into a

10

parking stall at KFC. The black male then ran across North MLK towards the area of North 4th Street and West Wright Street. Agents then witnessed BOND deliver suspected marijuana to WHITE and a male subsequently identified as "Chris" J. The vehicle proceeded to the Milwaukee police Department District 5, where "Chris" identified himself to officers in order to take custody of his son, who had been arrested. A check of the vehicle showed the owner of the 2000 Chevy Impala was Ladell M. WHITE.

48.     Agents observed BOND make two more deliveries to Ladell WHITE, in conjunction with intercepted calls. The deliveries occurred on June 1, 2010 at about 3:30 PM at the VALUE VILLAGE, located at 321 W. North Avenue, and on June 3, 2010, at about 7:49 PM at the McDonald's located at 5191 N. Teutonia Avenue. These deliveries were photographed and/or recorded, and WHITE used his vehicle for each of the deliveries.

49.     Based upon information obtained through debriefings of cooperating defendants, WHITE was a mid-level dealer for Michael BOND who received approximately two pounds of marijuana a week in half to one-pound quantities. BOND began selling marijuana to WHITE approximately 2-3 months prior to the arrests of individuals in this case on June 9, 2010.

## Maxine BOND

50.     In a consensually recorded phone call between CS #1 and Michael BOND on January 5, 2010, BOND told CS #1 that he gave his sister, Maxine BOND $50,000 cash to hold for him while he went to prison for two months to serve a revocation. BOND stated that Maxine BOND used the money to open a Certificate of Deposit, which will mature in a year. During this same conversation, BOND voiced his disdain for Maxine BOND's boyfriend, and commented that he hated the idea of the boyfriend living in the house he (BOND) got for her (Maxine BOND).

51.     On April 15, 2010, at about 5:15 PM, in a consensually recorded call, BOND admitted to CS #1 that he wanted to get one of "Pooney's" (BOND's nephew, Dominique PHILLIPS) guns last week, but decided against it as he feared the police would catch him riding down the street with it. CS #1 asked if BOND was going to Maxine BOND's residence to get it. BOND replied that she told him to come and get the guns, as BOND said he "needed one of those heaters."

52.     On May 24, 2010, at approximately 10:43 AM, agents intercepted a phone call between BOND and Maxine BOND, at (414) 699-9993. This phone number is subscribed to Maxine BOND's boyfriend, O.H. During this call Maxine BOND stated that "the Man" (Department of Corrections personnel) was coming to her house the next day, as her son (Dominique PHILLIPS) is due to be released from prison. The two further discussed cars and loans, and BOND told Maxine BOND, "I own mine for pimpin' (drug trafficking)." BOND commented that if he could just stay out for five more good years, he would have $4,000,000 to $5,000,000. Maxine BOND told BOND he has to come out of that though, and needs to find some sort of business. BOND replied that this

11

would be his last year.

53.    On June 9, 2010, agents arrested Maxine BOND, at her residence and executed a search warrant. A loaded .38 caliber revolver was found in the nightstand drawer, next to her bed. A card was also located during the search warrant. This card indicated that someone had rented unit #A141 at Public Storage, located at 5730 N. Lovers Lane Road, Milwaukee. Seized bank statements for Maxine BOND's account reflected she paid for the storage unit rental from her bank account. On June 9, 2010, Maxine BOND gave written consent for agents to search this storage unit. Agents found an SKS assault rifle with loaded magazines next to it, an AK-47 assault rifle with loaded magazines next to it, a MAC 10 submachine gun and a .357 handgun with a scope inside unit #A141. According to Public Storage records, Maxine BOND's live-in boyfriend, O.H., rented the unit on March 23, 2009; six days before the search warrant at 27XX N. 20th Street. Records showed that only Maxine BOND and Dominique PHILLIPS has access to the unit, and the unit rental was paid through Maxine BOND's bank account.

54.    Based upon information obtained through debriefings of cooperating defendants, Maxine BOND knew of Michael BOND's drug trafficking, though had no part in the operation. However, Maxine BOND was aware that firearms were stored by her son, Dominique PHILLIPS, in that locker, and those weapons were possessed in connection with the drug trafficking operation.

### Sherri Ann BOND

55.    Sherri Ann BOND is the Executive Director of the Jabez Residential Living Center, located in two buildings: 5926 and 5927 N. Teutonia Avenue, Milwaukee, Wisconsin. CS #1 and CS #3 advised agents that Sherri Ann BOND employed members of the DTO at her business, allegedly to provide the guise of legal employment, especially if they were on probation or extended supervision. CS #3 believed Sherri BOND is involved in, or is aware of the DTO's operations, as she cautioned employees at JABEZ not to discuss DTO matters over the land-line telephone in the event the telephone was being intercepted by law enforcement. Furthermore, CS #3 said that Valerie BROWN'S mother was formerly employed there, but was fired in April 2009, after she kept questioning why paintings were being sent to the business. The mother checked a painting and found what she recognized to be drugs concealed in it. CS #3 further stated that Sherri Ann BOND received $70,000 in donated furniture from Steinhafels for her non-profit business. CS #3 stated that Sherri Ann BOND and other members of the BOND family misappropriated the donated furniture in that they took the donated furniture for themselves, and/or sold it and pocketed the proceeds.

56.    On October 16, 2009, Michael BOND, who was incarcerated at the time, placed a call to his sister, Sherri Ann BOND. This call was recorded, as are all outgoing calls placed by persons in the custody of the Federal Bureau of Prisons. During this call, Sherri Ann BOND told BOND that she is waiting for 750 ($750,000) to come, and that it should be there before BOND comes home. She and BOND discussed her credit score and the building she was planning to purchase provided she could get a loan. Sherri Ann BOND mentioned she only needed $200,000, but planned

12

to ask for a $1,000,000 loan, and then spend it and buy BOND a building (across the street). Sherri Ann BOND stated that she could get BOND a laundromat, and that he would need a parking lot for it. She and BOND discussed whose name would be on the occupancy permit for the proposed building she planned to purchase for her residential living center business, but that BOND would in fact operate it for her.

57.    On May 21, 2010, at approximately 7:41 PM, Michael BOND placed a call to Sherri Ann BOND at the Jabez Residential Living Center. BOND told her that, "he did not get it ... you know what happen ... legal stuff ... when they sent the money out, the lady did not have the correct ID." Agents believe the call was in reference to a Moneygram payment sent to BOND's Mexican source of supply that could not be obtained due to the female recipient not having the correct identification.

58.    On June 4, 2010, Michael BOND placed a call to the JABEZ RESIDENTIAL LIVING CENTER. BOND BOND told an unidentified female that he would be over there, "I can't wait to get Tone in front of Sherri Ann (BOND), because he was lying about me. If it wasn't for me, Sherri wouldn't have the business." BOND stated that his money put everything together (referring to the JABEZ RESIDENTIAL LIVING CENTER), not "Tone's."

59.    Based upon information obtained through debriefings of cooperating defendants, Sherri Ann BOND was aware of Michel BOND's drug trafficking, and periodically asked Michael and Darius BOND for money, knowing the true source of the money. She further employed members of the drug trafficking organization at her business for cash, knowing that it would cost her far more to legitimately hire true employees. According to these sources, Sherri Ann BOND was unaware that drugs were packaged, stored, and dealt from her business.

### Randa Darcel CISTRUNK

60.    CS #1 told agents that Randa Darcel CISTRUNK had been a girlfriend of BOND's since 1991, and allowed him to live at her duplex, and keep the majority of his personal property in the attic. CS #1 added that CISTRUNK had knowledge of the BOND DTO's operations, and allowed her residence to be used as a stash house. CS #1 stated that CISTRUNK ran a day care on the first floor, where she also resided, and the second floor was largely vacant but used to store her things. According to CS #1, CISTRUNK and BOND had access to every area in the duplex.

61.    CS #1 met twice in person with BOND in November and December 2008 at the residence BOND shared with CISTRUNK at 25XX N. 39th Street. The first time BOND showed CS #1 a dark blue plastic bin secreted in the attic of that residence, which contained what appeared to be in excess of 50 pounds of marijuana. BOND explained to CS #1 how he received the marijuana from his Mexican SOS, and how he sends payment for the fronted drug shipments back to the SOS, as well as to other co-conspirators in the DTO. BOND told CS #1 that the drugs were delivered via FedEx shipments, delivered at various addresses.

13

62. The second time CS #1 met with BOND, BOND picked up what appeared to be a large painting, described as a Mexican or Southwest landscape painted on wood, approximately 3'x3'x2" in size from an unknown female's apartment, used as a stash house. BOND and CS #1 then drove to BOND's residence at 25XX N. 39th Street. CS #1 observed BOND pry apart the wood with a crowbar and a hammer. BOND then extracted two large tubes of compressed marijuana from the inside of the painting and tossed it into a large plastic storage bin.

63. At the direction of agents, CS #1 conducted a controlled purchase of marijuana from BOND inside the residence on February 2, 2010, and again on March 31, 2010. Both transactions occurred in the attic, while CISTRUNK was home. CS #1 noticed that BOND stored the marijuana in the attic, and kept a stolen $50,000 diamond and platinum ring he had possession of there as well.

64. From May 19, 2010 to June, 2010, agents intercepted numerous calls placed to/from BOND's cellular telephone to (414) 455-3157, a number subscribed to CISTRUNK. During the majority of the calls, BOND and CISTRUNK discussed drug activity and members of the BOND DTO. During a call on May 22, 2010, at approximately 7:55 PM, CISTRUNK told BOND, "you have to leave something. People want to smoke it and see what it is." CISTRUNK told BOND if they (customers) liked it, she would beat their (other drug dealers') prices.

65. On June 1, 2010, at approximately 8:27 PM, BOND placed an outgoing call to CISTRUNK. BOND told CISTRUNK that he could not get in touch with Darius BOND, who was aware that BOND needed to send money out so that his SOS can send BOND more "shit" (marijuana) that Saturday. Darius BOND owes BOND money, but instead of paying BOND, Darius gave $5,000 to his mother, Sherri Ann BOND. BOND told CISTRUNK that he has eight pounds of "weed" left, and he needs to send out $1,600 (to his SOS). BOND admitted to CISTRUNK that he got 50 pounds of weed (marijuana) on Thursday. He fronted Darius BOND 10 pounds, for which Darius BOND has not re-paid him. BOND continued to complain to CISTRUNK about Darius BOND, and told CISTRUNK that, "...he (Darius BOND) gets them (pounds of marijuana) for $600, and sells them for $800, and these niggas sell them for $1,000." BOND continued, "He has eight pounds of weed left. That's eight thousand dollars. That's my profit!"

66. At approximately 9:08 PM, BOND placed an outgoing call to CISTRUNK and stated that he always told the Mexicans (SOS), "...if y'all ask for it, I would give it to y'all," (referring to sending all of the money for fronted drug shipments at once, as opposed to sending the payments in $2,000 increments). BOND continued, "If wasn't for them, I wouldn't have the million dollars, but you can't fuck that up though, cause your word ain't no good no more." BOND also told CISTRUNK, "I'm not giving you no more pounds."

67. On June 3, 2010, at approximately 6:51 PM, BOND received a call from CISTRUNK, who asked BOND if his "friend" (a new Columbian SOS, identified in calls as "Columbian Tony") had called BOND back. BOND told CISTRUNK he did, but that he (BOND) will only do "weed," not the cocaine. At approximately 7:11 PM, BOND received another incoming call from CISTRUNK. BOND told CISTRUNK that the Columbian "plug" (SOS) wanted to send BOND 200

14

pounds (of marijuana) and 20 "keys" (kilograms of cocaine). CISTRUNK stated, "Those keys would have gone fast because no one has any." BOND told CISTRUNK that this potential SOS told him, "20 keys and 200 pounds of weed, (they) would be rich in six months." BOND tells CISTRUNK that he does not want to do the cocaine. CISTRUNK told BOND that cocaine is hard to find, and that she would not try to get back into it, but that she would do it one more time and then get out.

### Josie Marie STENNIS

68.     On May 20, 2010, at approximately 8:44 AM, BOND received a call from (414) 74-8913, which is subscribed to his sister, Josie Marie STENNIS. BOND told her, "This is my last year. I'm through after this year." BOND figured that if he has a million dollars by the end of January 1, 2011, he doesn't "need to be in the game." They discussed a girl that Sherri Ann BOND had hired. BOND was upset that Sherri Ann BOND told the girl, "...that building over there is in my name," and the girl told the kids, who would then tell "them people" that. BOND felt that Sherri Ann BOND is using him, and stated that Sherri Ann BOND further told another person "that their Benz (Mercedes) was mine." BOND stated, "Don't be gettin' me in no trouble because you can't handle your responsibilities." BOND continued, "Girl told me, 'Uncle Mike, Auntie Sherri that, said the building is yours, that I, um, should ask you about how you pay the water bill." BOND stated, "...that shit starts probation     and parole people..." STENNIS finished, "Into your business."

69.     On May 22, 2010 at approximately 11:23 AM, BOND received a call from STENNIS, who said, "Hey, alright, we good on one pound. I got a buzz bad but, I'm going to see how long it's going to last, because the other did not last long." BOND questioned the other one, to which STENNIS replied, the last one that BOND had her vouch for with a customer. STENNIS continued, "Now it did not last long, but is good, you know, you got a buzz. I got a buzz now, but that's it. Well I can tell how long it's going to last. That's when you tell its good weed, because it will take you there for a minute... it will, keep you on cruise."     STENNIS said the weed had a funny taste. BOND told her that the stuff keeps the dogs away.

70.     Agents executed a search warrant at Josie Marie STENNIS' home on June 7, 2010, and recovered a small amount of marijuana.

71.     Based upon information obtained through debriefings of cooperating defendants, Josie Marie STENNIS knew of Michael BOND's marijuana trafficking, and essentially served as his "taste tester" for the marijuana shipments, and BOND himself did not use drugs. She would receive a small amount of marijuana from every shipment, but had no other role in the organization.

15